**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

DAVID FULP,                                )
                                           )
                    Plaintiff,             )
         v.                                )
                                           )
COLUMBIANA HI TECH, LLC,                   )          1:16CV1169
                                           )
                    Defendant.             )
                                           )


**MEMORANDUM OPINION AND ORDER**

Plaintiff David Fulp filed this action against his former employer, Defendant

Columbiana Hi Tech, LLC "(Columbiana"), alleging disability discrimination in

violation of the Americans with Disabilities Act[1]. (See Compl. [Doc. #1].)  This

matter is before the Court on Columbiana's Motion for Summary Judgment [Doc.

#17] and its Motion to Seal [Doc. #29].  For the reasons explained below, the

motions are granted.

I.

A.

In April 2015, several months before applying for employment with

Columbiana, Fulp was diagnosed as having "posterior subscapular polar senile

cataract" in both eyes. (Columbiana's Br. in Supp. of its Mot. for Summ. J. ("Br. in

---

[1] In Paragraph 1 of his Complaint, Fulp asserts that that he is bringing the ADA
action, "and wrongful discharge based on State Law."  However, Fulp asserts only
two claims for relief, both of which fall under the ADA. (See Compl. ¶¶ 24-35.)
He alleges no wrongful discharge claim under North Carolina law.

Supp.") Ex. E (Summit Eye Care Recs.) at 4[2] [Doc. #18-11]; Br. in Supp. Ex. F

(O.U., Stedman's Med. Dictionary (26th ed.).) He returned to his ophthalmologist,

Dr. Vic Khemsara, on May 15, 2015, to discuss treatment options and his desire

to have surgery. (Ex. E at 6.)

On June 5, 2015, Dr. Khemsara removed the cataract from Fulp's right eye

and implanted an intraocular lens. (Id. at 7.) Fulp "tolerated the procedure well and

left the operating room in good condition." (Id. at 8.) He returned the following

day for a post-operative check-up during which he had no complaints, and his right

eye's visual acuity was 20/20. (Id. at 9.)

On July 1, 2015, Fulp had the cataract in his left eye removed and an

intraocular lens implanted. (Id. at 14.) As was the case with his June surgery, he

"tolerated the procedure well and left the operating room in good condition." (Id. at

15.) At his post-operative check-up the following day, he had no complaints, and

the visual acuity in his left eye was 20/20. (Id. at 16.) He was described as

having "Excellent post op course", and his condition was improving. (Id. at 17.)

On July 9, 2015, his visual acuity in his left eye measured 20/20, his post-op

course was once again described as excellent, and he was told to return in six

months. (Id. at 18-19.)

---

[2] Page numbers associated with exhibits are those assigned by the electronic
docketing system.

B.

The following month, after having had both cataracts removed and intraocular lenses implanted, on August 3, 2015, Fulp applied for employment as a welder with Columbiana in Kernersville, North Carolina, (Br. in Supp. Ex B (Emp't Application)), a leading manufacturer of custom nuclear transportation and storage systems, (Larry Keaton Aff. ¶ 3 (Sept. 18, 2017)).  As part of his employment materials, Fulp signed a "Receipt of Employment Handbook and Employment-At-Will Statement", which provided, in part, that Fulp acknowledged receiving a copy of Columbiana's Employee Handbook, that he agreed to read and comply with it, and that his employment was at-will. (Laura Lynn Laws-Alamillo Aff. (Sept. 18, 2017) Ex. 2 [Doc. #22-5].)

The Employee Handbook in effect during Fulp's employment provided, among other information, the company's standards of conduct and explained that an employee could be disciplined, including discharged, for violating company policies and insubordination, among other conduct. (Laws-Alamillo Aff. Ex. 1 Pt. B at 36 [Doc. #22-3].)

 The Employee Handbook also set out the company's equal employment policies, including providing reasonable accommodation for qualified individuals to perform the essential functions of the job and noting the employee's responsibility to notify the Human Resources Director of the need for accommodation. (Laws-Alamillo Aff. Ex. 1 Pt. A at 15 [Doc. #22-2].)

Fulp also completed a form entitled "Voluntary Self-Identification of Disability" in which he stated, "No, I don't have a disability". (Laws-Alamillo Aff. Ex. 3 [Doc. #22-6].)  Fulp explained at his deposition that, as of August 3, 2015, he did not believe he had a disability. (David Fulp Dep. 70:13-71:15 (Aug. 14, 2017) [Doc. #18-6[3]].)  He did, however, tell Laura Laws-Alamillo, Columbiana's Human Resources Director in Kernersville, that he was "currently undergoing eye surgeries and having implants put in [his] eyes because they had put the wrong implants in [his] eyes." (Id. 71:25-72:2; see also id. 72:20-73:4; Laura Lynn Laws-Alamillo Dep. 24:23-25:2 (Aug. 16, 2017) [Doc. #23-4[4]].)  He believed he had a minor setback, but no disability. (Fulp Dep. 74:1-6.)  After all, as of August 3, 2015, he believed he could see close enough to do the job of a welder. (Id. 75:7-13.)

C.

Columbiana fabricates dry-shielded canisters, fuel assembly packages, liquid transportation vessels, and other equipment for the nuclear industry. (Keaton Aff. ¶ 4.)  Its stringent welding standards and quality control protocols reflect the high degree of care demanded by that industry. (Id. ¶ 5.)  In addition, Columbiana's customers may have even more strict requirements, so every job has its own book of procedures that are made available to employees. (Kenneth L. Atkins Dep. 27:1-

---

[3] Fulp's entire deposition is available from Doc. #18-5 through Doc. #18-10. Excerpts are also available at Doc. #23-1.
[4] Excerpts of Laws-Alamillo's deposition may be found at Docs. #18-4 and 23-4.

19 (Aug. 16, 2017) [Doc. #23-5[5]].)  Therefore, each of Columbiana's welders have to pass several difficult training tests before being allowed to work on the line on customer projects. (Keaton Aff. ¶ 6.)  The welder completes six training tests, and each weld goes through several layers of review by a supervisor, a quality control inspector, and a third-party company. (Larry D. Keaton Dep. 16:25-17:11, 28:19-31:1 (Aug. 17, 2017) [Doc. #18-2[6]].)  After completing these tests, the welder must participate in separate Columbiana-specific quality control and safety training. (Id. 31:11-22.)

Fulp began his testing and training under shop foreman Larry Keaton during the first shift and completed the testing and training under supervisor Kenny Atkins on second shift. (Fulp Dep. 127:9-21.)  Before moving to second shift, Fulp told Atkins of his "vision problems" and that he had "just recently had cataracts removed" which were replaced with the "wrong implants" that "they were in the process of redoing them". (Fulp Dep. 131:23-132:6; see also Atkins Dep. 37:2-13 (describing the same).)

Once Fulp moved to second shift, he requested and received from Atkins "cheater lenses", lenses inserted behind the welder's hood that have different focal points. (Fulp Dep. 76:13-77:13, 134:1-10.)  Cheater lenses were commonly used by welders, even by Atkins, (Atkins Dep. 50:8-18), and Fulp kept his lenses throughout his employment at Columbiana, (Fulp Dep. 79:5-16).  In most

---

[5] Excerpts of Atkins' deposition may be found at Docs. #18-15 and 23-5.
[6] Excerpts of Keaton's deposition may be found at Docs. #18-2 and 23-6.

circumstances, the cheater lenses addressed any issues Fulp had seeing clearly up-close. (Id. 108:20-109:2.)

In fact, outside of work, although he has had prescription glasses since 2010 when his girlfriend "coerced" him into obtaining them, he only wears them "every once in a while" and only then "for a couple of minutes to see how they work." (Id. 45:3-46:3, 112:10-21.)  He has never worn them to weld. (Id. 46:4-16.)  Even without his eyeglasses, after his cataract removal surgeries, he was able to drive day and night without restrictions on his license and to read, except when he needed to zoom in on a phone screen to see better. (Id. 93:18-24, 109:20-110:16; Larry Wayne Kendrick Dep. 21:8-23 (Aug. 15, 2017) [Doc. #18-19[7]] (testifying that Fulp drove himself to work for the second shift, which lasted from 4:00 p.m. to 2:30 a.m.).)

On August 14, 2015, unhappy that his up-close vision was blurry, Fulp returned to Dr. Khemsara to discuss the option of having his lenses replaced with multifocal lenses. (Br. in Supp. Ex. E at 20.)  At the time, his visual acuity in each eye was 20/20. (Id. at 22.)  On August 21, Dr. Khemsara removed the distance lens in Fulp's right eye and replaced it with a multifocal lens and noted no complications. (Id. at 25-26.)  The following day, the visual acuity in his right eye measured 20/25. (Id. at 27.)  Dr. Khemsara discussed with Fulp that the lens implant would do a good job of giving him a range of vision but "for prolonged

_____

[7] Excerpts of Kendrick's deposition may be found at Docs. #18-19 and 23-3.

reading or computer work" Fulp would "need to wear some reading glasses." (Fulp Dep. 111:7-112:6.)  On August 28, the visual acuity in his right eye measured 20/30. (Br. in Supp. Ex. E at 28.)  Dr. Khemsara described an "[e]xcellent post op course" and noted that Fulp's condition was improving and he was seeing well in the right eye. (Id. at 29.)  At a September 11 appointment, his visual acuity in each eye measured 20/25. (Fulp Dep. 116:21-117:6.)  Fulp was scheduled to have the lens in his left eye replaced with a multifocal lens on October 2. (Br. in Supp. Ex. E at 30-31.)

## D.

Fulp's testing at Columbiana took several weeks to complete. (Fulp Dep. 77:24-78:20.)  During this time, once on second shift, Atkins "was consistently coming over [to Fulp] and saying there was stuff in the welds that wasn't there, even though he and [Fulp] had already discussed it." (Id. 76:13-17.)  Atkins would require Fulp "to grind something out" because a particular weld had "undercut" and "wasn't going work". (Id. 79:19-21.)  According to Fulp, Atkins "was being real meticulous", "always lurking in the shadows", "micromanaging", and "stating there was things in the weld when there wasn't." (Id. 128:17-20; see also David Fulp Decl. ¶ 4 (Oct. 17, 2017) [Doc. #23-2] (describing Atkins as acting hostile and loud and "constantly micromanag[ing] [Fulp's] weld quality".)

One particular incident involved a testing plate that Fulp had completed and asked Atkins and Kyle Alexander, the Quality Control Inspector, to inspect. (Fulp Dep. 136:2-4.)  After they approved it for the band saw, Fulp inadvertently

dropped his grinder on the plate. (Id. 136:4-13.)  To repair it, he took his gun and ran a bead across the top of it to make it smooth. (Id. 136:13-16.)  Atkins witnessed Fulp add the bead and required him to throw out that test plate and start anew because he had not welded it in position. (Id. 136:17-137:2.)  During his deposition, Fulp acknowledged that he knew the plate was not in position anymore when he added the bead, but said that he "didn't know that they was actually going to complain about it once they had already signed off on it." (Id. 138:24-139:6.)  According to Fulp, he never saw Atkins order other welders, whom Fulp did not believe had vision problems, redo work. (Fulp Decl. ¶ 4.)  One of Fulp's co-workers, the lead welder on his shift, thought Fulp's work "looked good". (Kendrick Dep. 45:14-18.)

E.

After Fulp completed testing on September 5 or 6, he worked as a "shop grunt" until he received his "stamp" to begin welding on customer projects on September 16. (Fulp Dep. 77:24-79:4.)  On that day, he "had a position part on the table that had to be clamped down." (Id. 139:14-15.)  To work on this weld, "body size, type of person size, weight and everything else has a lot to play in it, the length of your arms and your legs, whatever." (Id. 139:18-21.)  "[T]he position and [his] vision all was playing a factor", and his "eyes couldn't focus on it." (Id. 140:18-141:20.)  His arms were extended trying to reach into the bottom of the weld, and he was having a hard time seeing it. (Id. 139:21-140:2.)  When asked at his deposition if the part was blurry, Fulp said that he "just couldn't see it." (Id.

140:3-17.)  Fulp asked Atkins if he could lay the part on the table, and Atkins

responded, "Hell, no.  If you get caught moving these, no". (Id. 141:8-14, 145:10-

11.)  According to Fulp, at the next pre-shift employee meeting, Atkins told

everyone, "Anybody caught moving the parts around the table without proper

authorization . . . you can't be doing that.  That's against company policy" and

required an engineer's participation. (Id. 145:11-18.)  Fulp felt that Atkins was

being overly dramatic, because Fulp was simply submitting an idea to Atkins, as

the handbook encouraged. (Id. 145:19-24.)  "It became very obvious [to Fulp] that

no one in that facility knew anything but Kenny". (Br. in Supp. Ex. H at 4 (Fulp

Personal Notes Submitted on Sept. 21, 2015 to Larry Keaton) [Doc. #18-14].)

Nevertheless, at his deposition, Fulp admitted that Atkins had the authority to

instruct Fulp on the proper technical way to complete the weld pursuant to

company policy, including prohibiting Fulp from completing the weld on the table.

(Fulp Dep. 146:2-9; see also id. 146:10-16 (admitting Atkins' refusal to allow Fulp

to complete the weld on the table was based on Atkins' belief that the weld would

not meet the company's welding standards).)

On September 18, 2015, Fulp's last day of employment at Columbiana, he

was working on a weld when Atkins pointed out undercut, something he had

previously noticed in Fulp's welds. (Id. 147:1-13, 174:16-18 (explaining that

Atkins "had found undercut in . . . actually about all my other ones".)  Undercut is

a gap in the weld joint as a result of "run[ning] it too hot or . . . pulling it too fast"

so "the filler metal [does not] actually fill up the weld joint itself." (Id. 147:15-21.)

To fix the undercut, the welder hesitates and allows the gap to fill. (Id. 147:22-148:2.)  To avoid undercut on the next part, Fulp hesitated, but, as a result, Atkins criticized him for the resulting knots in the weld. (Id. 148:4-149:10; Br. in Supp. Ex. H at 4; Kenneth Lane Atkins Aff. ¶¶ 10-11 (Sept. 18, 2017) [Doc. #19]; Atkins Dep. 41:21-22.)  Fulp acknowledged hesitating to fill the undercut, but disagreed that it was excessive buildup. (Fulp Dep. 149:10-13; Fulp Decl. ¶ 8.) Atkins then had Alexander inspect the weld who explained that sometimes fixing something causes more damage so the best thing to do was to leave it alone. (Fulp Dep. 150:1-14; Br. in Supp. Ex. H at 4; Atkins Aff. ¶¶ 12-13; Atkins Dep. 41:24-42:1; Kyle Alexander Aff. ¶¶ 3-5 (explaining that, as Quality Control Inspector, he was called to inspect Fulp's weld and noticed excessive buildup in the corner due to hesitation, but believed that repairing the weld would do more harm than leaving it) (Sept. 18, 2017) [Doc. #20].)  After Alexander approved the weld, Atkins told Fulp that he was not to hesitate in the bottom of welds anymore. (Fulp Dep. 150:22-25; Br. in Supp. Ex. H at 4; Atkins Aff. ¶ 14; Atkins Dep. 42:2-3; Alexander Aff. ¶ 6; see also Atkins Dep. 42:3-4, 45:11-14 (explaining that Atkins had previously specifically instructed Fulp not to stop and start in corners).)

When Fulp moved to the next part, he tried something different, borrowed a stool, and crawled on top of it to have a better welding position, explaining that if he were taller, he would not have needed the stool. (Fulp Dep. 151:6-25, 176:2-7; Br. in Supp. Ex. H at 4.)  After Fulp completed several vertical welds, Atkins saw that Fulp had stopped in the corner of the weld again. (Atkins Dep. 44:1-6.)

According to Fulp, Atkins told him to pack up his belongings and leave because "it's apparent you're going to do things the way you want to do them instead of the way I told you to do them." (Fulp Dep. 152:4-17; see also Br. in Supp. Ex. H at 5; Atkins Aff. ¶¶ 16-18.) Atkins said nothing to Fulp about his vision during the shift. (Fulp Dep. 161:23-162:3.)

Fulp disagreed with Atkins' welding instruction and, instead, believed it was appropriate to start and stop in the corners, (id. 179:12-14, 180:19-22), and told Atkins that he had been doing this long enough to know what he was doing, (Br. in Supp. Ex. H at 5; Atkins Aff. ¶ 15). At his deposition, Fulp acknowledged that stopping and starting in the corners of that weld was his decision regardless of the impact of his vision and that he did not request an accommodation for his eyesight. (Fulp Dep. 175:18-21, 182:12-22.) He was asked, "So if you wanted to weld the way Kenny specifically instructed you to weld you could have done it?" to which he responded, "Pretty much." (Id. 180:4-7.)

Immediately after Atkins terminated Fulp, Atkins called someone with Columbiana, and Fulp recorded Atkins' side of the conversation with his phone. In the conversation, Atkins explained that Fulp had refused instruction to stop his welds in the middle of the part rather than in the corners. (Br. in Supp. Ex. J at 2 (Trans. Sept. 18, 2015, Audio Recording) [Doc. #18-16]; Fulp Dep. 183:22-190:8 (testifying that the transcript is a true and accurate copy of his recording).) In response, Fulp said to Atkins, "Tell him the truth. You come over there and start chastising cause I stopped at the bottom." (Br. in Supp. Ex. J at 2.) After Atkins

said again, "I told you not to stop in the corners", Fulp explained that he built up the weld intentionally. (Id.)

The following Monday, September 21, 2015, Fulp returned to Columbiana to meet with Laws-Alamillo and Keaton and recorded that conversation, as well. Laws-Alamillo had read Fulp's typed personal statement compiled from notes he had maintained on his phone during his employment. (Br. in Supp. Ex. K at 8 (Trans. Sept. 21, 2015, Audio Recording) [Doc. #18-17]; Fulp Dep. 190:17-191:25.) During his meeting with Laws-Alamillo and Keaton, Fulp explained that he knew that Atkins "was going to do everything in his power because somewhere along the line somebody has said something to him about [Fulp's] skill level". (Br. in Supp. Ex. K at 9.) According to Fulp, "that's exactly what" Atkins did – "[h]e . . . used that against me." (Id.) He told Laws-Alamillo that he asked Atkins for some cheater lenses, which Atkins gave him. (Id.) Even so, Fulp believed "[t]here was no way [he] could do what [Atkins] said to do. For one – [his] height. Ever heard of ergonomics?" (Id. at 11.) Columbiana investigated Fulp's termination and concluded that Atkins' decision was justified and proper given Fulp's open insubordination in violation of company standards of conduct provided in the Employee Handbook. (Laws-Alamillo Aff. ¶¶ 7, 8; Laws-Alamillo Dep. 32:15-25.)

F.

Soon after his termination from Columbiana, Fulp gained employment with AC Corporation as a welder. (Fulp Dep. 25:13-22, 26:24-27:8.) He informed the company that he had cataract removal surgery in June, but was in the process of

having his implants replaced. (Id. 27:9-15.)  The company asked Fulp if this would

hamper his work, and he responded, "No"; he could see to weld hairline cracks.

(Id. 27:19-25, 28:13-16, 29:5-7.)  However, "after [he] was there a couple of

days and weeks", he "noticed a significant change in [his] vision." (Id. 28:16-21.)

He "could no longer see to weld small hairline cracks." (Id. 28:23-24.)  He

described the change as "just like flipping a light switch" – "one day you could

see, and the next day you couldn't". (Id. 29:2-4.)  When he attempted using

cheater lenses, he could not use them. (Id. 31:9-15.)  His "vision had deteriorated

a whole lot from the time [he had] actually left Columbiana to [that] time". (Id.

31:15-17.)  As a result, Fulp only worked for AC Corporation for two weeks. (Id.

26:2-7.)  He has had a series of short-lived welding positions since then. (Id. 32:3-

37:21.)

On January 18, 2016, Fulp filed a Charge of Discrimination with the EEOC,

alleging discrimination on the basis of disability. (Br. in Supp. Ex. L (Charge of

Discrimination) [Doc. #18-18].)  In the narrative, Fulp states,

> At the time of my employment and termination, I suffered from
> cataracts, which were complicated by an improperly performed
> cataract removal and lens replacement surgery.  I made the company
> aware of these issues early in the hiring process and told the
> Company that I was scheduled for corrective eye surgery on or about
> October 2, 2015.

(Id.)  He further explained that he made Atkins aware of his "disability" after which

Atkins displayed a pattern of hostility towards him, including chastising him for

using moisturizing drops, and on September 18, 2015, terminating him after Fulp

could not weld from the required position because he could not see properly. (Id.)

After receiving his Notice of Right to Sue, (Ex. B to Compl.), Fulp filed the instant action alleging two claims for relief: violation of the ADA[8] on the basis of discrimination and violation of the ADA for failure to provide reasonable accommodation, (Compl. ¶¶ 24-35).

## II.

"Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law,' Fed. R. Civ. P. 56(a)." Groves v. Commc'n Workers of Am., 815 F.3d 177, 181 (4th Cir. 2016). The moving party bears the initial burden of establishing "the basis for its motion[] and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)[9]). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v.

_____

[8] The ADA was amended with the Amendments Act of 2008, which took effect January 1, 2009, Pub. L. No. 110-325, 122 Stat 3553 (Sept. 25, 2008), and, therefore, applies here. For consistency, the Act, as amended, is referred to as the ADA throughout this Opinion.

[9] Rule 56(c) was amended effective December 1, 2010, but the substance of the rule did not change.

Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A dispute is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. Id. at 248. The materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. Id.

The Americans with Disabilities Act prohibits employment discrimination on the basis of a disability. See 42 U.S.C. § 12112(a). To establish a prima facie case of disability discrimination, an employee must show that (1) he was a qualified individual with a disability, (2) he was discharged, (3) he was fulfilling his employer's legitimate expectations at the time of discharge, and (4) the circumstances of his discharge raise a reasonable inference of unlawful discrimination. Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 150 (4th Cir. 2012). Once the employee meets this burden, the employer must produce evidence of a legitimate, nondiscriminatory reason for the termination. Jacobs v. N.C. Admin. Office of the Cts., 780 F.3d 562, 575 (4th Cir. 2015). If the employer does so, the employee must then prove that the asserted justification is pretextual. Id. at 575-76.

A.

Before an employee may file suit against his employer alleging a violation of the ADA, he must first exhaust his administrative remedies by filing a charge of discrimination with the EEOC. Sydnor v. Fairfax Cty., Va., 681 F.3d 591, 593 (4th Cir. 2012). This requirement "ensures that the

15

employer is put on notice of the alleged violations, thereby giving it a chance to address the alleged discrimination prior to litigation" and allows the EEOC an opportunity to respond first. Id. (internal quotations and citations omitted.) As a result, "the scope of the plaintiff's right to file a federal lawsuit is determined by the charge's contents." Id. "The touchstone for exhaustion is whether plaintiff's administrative and judicial claims are 'reasonably related'." Id. at 594. "Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent [ADA] lawsuit." Chacko v. Patuxent Inst., 429 F.3d 505, 506 (4th Cir. 2005).

Here, Fulp's Complaint does conform to the charge of discrimination he filed with the EEOC – both allege discrimination on the basis of Fulp's vision disability. (Compare EEOC Charge (Br. in Supp. Ex. L) with Compl.) In other words, he has exhausted his administrative remedies for the claims he advances in the instant action.

As Columbiana recognized in its Reply Brief [Doc. #26], the trouble arises in Fulp's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Brief in Opposition) [Doc. #25]. Throughout his Brief in Opposition, Fulp described a second disability – diabetes – in addition to his cataracts. (See Br. in Opp'n at 2, 3, 7-8, 9, 15.) However, diabetes is not mentioned at all in the Complaint. "[I]t is well established that a plaintiff

16

may not raise new claims after discovery has begun without amending his complaint." United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co., 612 F.3d 724, 731 (4th Cir. 2010).

Even before Fulp could have amended his Complaint to include diabetes as an alleged disability, however, he would have had to exhaust his administrative remedies with the EEOC. There is nothing – not even argument by Fulp on the issue – from which the Court could conclude his diabetes is like or reasonably related to the vision problems asserted as a disability in the EEOC charge. Compare, e.g., Moore v. City of Overland Park, 950 F. Supp. 1081, 1086 (D. Kan. 1996) (finding the plaintiff's allegation of discrimination based on nicotine addiction and central nervous disorder barred for failure to exhaust administrative remedies where the only disability asserted in her EEOC charge was diabetes, and there was nothing from which the court could conclude that the disability claim based on diabetes was like or reasonably related to her disability claims based on nicotine addiction or central nervous disorder) with Canterbury v. Federal-Mogul Ignition Co., 418 F. Supp. 2d 1112, 1115-16 (S.D. Iowa 2006) (finding the plaintiff's diabetes discrimination claim could proceed because it was "sufficiently like or related to his reference to 'blood sugar' in his administrative claim, such that he reasonably could have expected that the scope of the investigation into the matter would have included investigation into his diabetic condition"). Furthermore, Columbiana attached to its Reply

Brief the EEOC investigative file which further supports the conclusion that the EEOC's investigation did not inquire into discrimination based on Fulp's diabetes.  Therefore, diabetes may not be used as a disability for which Columbiana allegedly discriminated against Fulp.

B.

Under the ADA, an individual has a disability if he has "a physical or mental impairment that substantially limits one or more major life activities" or "a record of such an impairment". 42 U.S.C. § 12102(1).  A "substantially limiting impairment" is one that "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(l)(ii).  "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." Id.  However, "[t]he ameliorative effects of the mitigating measures of ordinary eyeglasses or contact lenses [that are intended to fully correct visual acuity or eliminate refractive error] shall be considered in determining whether an impairment substantially limits a major life activity." 42 U.S.C. § 12102(4)(E)(ii), (iii); see also 29 C.F.R. § 1630.2(j)(1)(vi); Goodman v. Johnson, No. 1:11CV79, 2011 WL 13092908, at *3 (E.D. Va. May 24, 2011) (noting, where the plaintiff had admitted that he had 20/200 vision only when not wearing eyeglasses or contact lenses, that the plaintiff's "ADA claims must address his vision with the aid of eyeglasses"

and dismissing those claims "[b]ecause [he] has not alleged that his vision is impaired when he is using eyeglasses or contact lenses").

Columbiana argues that Fulp cannot show that his ability to see was substantially limited by a disorder or impairment and that he was, therefore, not disabled under the ADA. (Br. in Supp. at 25.) In response, Fulp argues that he was disabled as a result of his "serious vision problems", including blurry close-up vision, for which he received ongoing treatment related to his cataract surgery. (Br. in Opp'n at 7-8.)

It is unclear from Fulp's brief whether he claims that the major life activity that his vision problems substantially limited was seeing or working or both, see 42 U.S.C. § 12102(2)(A). No matter which major life activity he claims his vision substantially limited, a reasonable jury could not find him disabled.

Fulp lived an independent life unrestricted by his vision. His visual acuity after cataract removal in June and July 2015 was 20/20, and Dr. Khemsara described Fulp's post-operative course as excellent. According to Fulp, he could even see well enough to weld when he applied in August to work at Columbia. He read and drove day and night without restriction. He had his right intraocular lens replaced with a multifocal lens on August 21, and his visual acuity ranged from 20/25 to 20/30 with an excellent post-operative course noted. Fulp had prescription eyeglasses but never wore them to weld and rarely, and even then only temporarily, wore them

19

elsewhere.  He has failed to acknowledge any ameliorative effect his eyeglasses had.

Fulp's own description of Atkins during Fulp's training was as a micromanager who was meticulous, constantly requiring Fulp to avoid undercut or stopping and starting in corners and to start anew on some parts.  He admitted that he had undercut and, to fix the problem, he hesitated to create buildup.  Although Fulp includes his vision as a factor in his inability to weld a particular part on September 16, he also described the problem as one related to "body size, type of person size, weight and everything else . . . the length of your arms and your legs".  In other words, he described not being able to see the part as an ergonomic problem.

On his last day of employment, his difficulties with welding arose not from vision problems, but admittedly from his repeated failure to follow the direction of Atkins, his shift supervisor whom Fulp acknowledged had the authority to approve and disapprove his welds and who made decisions based on company policy.  It was not until after Fulp left Columbiana, when he was working at AC Corporation, that he went from being able to see even hairline cracks one day to not being able to see the next, as though a light switch was flipped.  His vision had deteriorated "a whole lot" since he had left Columbiana.

While he may have had a vision impairment while working at Columbiana, he was not disabled, as that term is defined under the ADA.

See A Helping Hand, LLC v. Baltimore County, MD, 515 F.3d 356, 367 (4th Cir. 2008) (explaining that "[m]erely having an impairment does not make one disabled for purposes of the ADA").  In short, the evidence does not show that Fulp was substantially limited in seeing or working, as compared to most people in the general population, when he was terminated from Columbiana.

The inquiry into whether Fulp was disabled under the ADA does not end here, though.  The ADA also provides that an employee can be considered disabled if he is "regarded as having such an impairment" "whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(1), (3).  Fulp argues that he was disabled under the ADA because Columbiana regarded him as having an impairment – diabetes. (Br. in Opp'n at 8-9.)  However, as explained above, Fulp cannot rest his discrimination charges on diabetes.  As he advances no other impairment he was regarded as having, it is determined that, not only was he not actually disabled, but he was not regarded as having such an impairment.

## C.

Even if Fulp could show that he were disabled under the ADA, he cannot make a prima facie showing of discriminatory discharge because the evidence shows that he was not meeting Columbiana's legitimate expectations at the time he was terminated.  Furthermore, the evidence

does not support a reasonable inference that he was terminated because of his disability.

Columbiana fabricates equipment for the nuclear industry, requiring stringent welding standards and quality control protocols, both from Columbiana and its customers. There was a shop foreman, a quality control inspector, and a shift supervisor overseeing the testing and production work, and Fulp admitted that his shift supervisor, Atkins, had authority to instruct him on the proper technique pursuant to company policy. Furthermore, Fulp acknowledged that his passing the required tests did not mean that every weld he subsequently did in the production phase would be approved. (Fulp Dep. 144:4-8.) He described Atkins as "being real meticulous", "micromanaging", and requiring Fulp to correct welds. He recalled an incident in which he dropped his grinder on a test plate after Atkins and Alexander had approved it, then ran a bead across the top of the weld to smooth it, but discarded the plate and started anew at Atkins' direction because he had not followed proper procedure.

Because of the length of time it took to complete his testing, Fulp only welded for Columbiana customers from September 16 through September 18. He described an incident on September 16 during which he sought to complete a weld on the table, but Atkins refused to allow him to do so. Fulp acknowledged at his deposition that he understood Atkins' refusal to be

based on Atkins' belief that performing the weld in that manner would not meet company standards.

On September 18, his last day of employment, Atkins had repeatedly instructed Fulp to avoid undercut. To do so, Fulp admittedly hesitated to cause a buildup where there otherwise would have been a gap. Although Alexander concluded that fixing the weld would cause more damage than leaving it as-is, Atkins told Fulp not to do it again. At his deposition, Fulp admitted that he had been stopping and starting in the corners of the weld as instructed not to do and that he did so anyway because he disagreed with Atkins. Fulp even recalled that, as he was being terminated, Atkins told him that it was apparent Fulp was going to do things his way instead of Atkins' way. This is also what Fulp recorded Atkins saying over the telephone immediately after discharging Fulp.

It matters not that Fulp may have believed he was right. It is the employer's perceptions, not those of the employee, that determine whether an employee was meeting his employer's reasonable expectations at the time of discharge. See Hawkins v. PepsiCo., Inc., 203 F.3d 274, 280 (4th Cir. 2000) (recognizing that the Fourth Circuit has "repeatedly held that in a wrongful discharge action it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff" and describing the plaintiff's evidence as proving "only the unremarkable fact that she and [her employer] disagreed about the quality of her work") (internal quotations

omitted).  As a result, "an employee's own testimony about his job performance does not create a genuine issue of material fact as to whether he was meeting his employer's legitimate expectations." Howard v. College of the Albemarle, 262 F. Supp. 3d 322, 332 (E.D.N.C. 2017) (listing cases). Even though Fulp believed his technique was acceptable, he also admitted that if he had wanted to weld as instructed, he "pretty much" could have. See Jones v. Dole Food Co., Inc., 827 F. Supp. 2d 532, 547 (W.D.N.C. 2011) ("When an employee is aware of an employer's policy and violates it, he has not met the employer's legitimate expectations.")  In addition to Fulp's own review of his work, he offered Kendrick's observation that Fulp's work looked good.  However, "[t]he alleged opinions of [a plaintiff's] co-workers as to the quality of [his] work are similarly close to irrelevant." Hawkins, 203 F.3d at 280 (internal quotations omitted).  A reasonable jury could not find that Fulp was meeting Columbiana's legitimate expectations at the time of his discharge.

Furthermore, a reasonable jury could not reasonably infer that Fulp was terminated because of his disability.  Nothing described above supports such an inference.  Instead, the evidence shows that Fulp was discharged for failure to follow his supervisor's welding direction.  He acknowledged that he did not weld to his supervisor's standards, a supervisor he admitted had authority to instruct on the proper welding techniques.  While Fulp occasionally refers to Atkins taking action because of Fulp's vision, those

24

accusations are not supported by the record, as already described. In addition, when Fulp met with Columbiana representatives after his termination, he described Atkins' treatment of him as arising out of jealousy, not discrimination. He told Laws-Alamillo and Keaton that there was no way he could do what Atkins asked him to do because of ergonomics, but he testified that had he wanted to do so, he "pretty much" could have. Not even Fulp seems to believe there is a reasonable inference that he was discharged because of his vision problems. Because Fulp cannot meet his prima facie burden, it is unnecessary to analyze any other elements of this claim. Columbiana's motion for summary judgment on the discriminatory discharge claim is granted.

## D.

Under the ADA, unlawful discrimination includes the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual <u>with a disability</u> who is an applicant or employee". 42 U.S.C. § 12112(b)(5)(A) (emphasis added). In his Brief in Opposition, Fulp argues that Columbiana should have accommodated his "manner of welding". (Br. in Opp'n at 12.) Before considering this argument, though, it is apparent that this claim cannot survive summary judgment because, as analyzed above, Fulp is not disabled under the ADA. Even if he were found to have been "regarded as" disabled, an employer "need not provide a reasonable accommodation . . . to an individual" who is found to be disabled solely because he was regarded as being

disabled, 42 U.S.C. § 12201(h).  Therefore, Columbiana's motion for summary

judgment as to this claim is granted.

III.

Also before the Court is Columbiana's Motion to Seal [Doc. #29] Fulp's

medical records attached as Exhibit E to Columbiana's Motion for Summary

Judgment.  Because the Court relied upon those medical records in its disposition

of the motion for summary judgment, they are considered judicial records and are

subject to the First Amendment right of access.  See In re Application of the U.S.

for an Order Pursuant to 18 U.S.C. § 2703(D), 707 F.3d 283, 290 (4th Cir. 2013)

(defining judicial records); Rushford v. New Yorker Magazine, Inc., 846 F.2d 249,

252-53 (4th Cir. 1988) (applying the First Amendment standard to "documents

filed in connection with a summary judgment motion").  The First Amendment right

of access requires a showing "that the denial [of access] serves an important

governmental interest and that there is no less restrictive way to serve that

governmental interest." Rushford, 846 F.2d at 253.  The "court must give the

public adequate notice that the sealing of documents may be ordered", "must

provide interested persons an opportunity to object to the request before the court

ma[kes] its decision", and, if the documents are sealed, the court "must state its

reasons on the record, supported by specific findings" and "must state its reasons

for rejecting alternatives to closure." Id. at 253-54.

Columbiana's Exhibit E will be sealed.  These records contain Fulp's

confidential sensitive and personal medical information, the protection of which

26

serves an important governmental interest. There is no less restrictive way to serve that interest than sealing the entirety of those medical records because of the breadth of confidential information throughout the records. The public has had notice since the motion was filed on January 18, 2018, and no objections to their sealing have been made. Therefore, Columbiana's motion to seal Fulp's medical records in Exhibit E to Columbiana's motion for summary judgment is granted.

IV.

For the reasons stated herein, IT IS HEREBY ORDERED that Columbiana Hi Tech, LLC's Motion for Summary Judgment [Doc. #17] is GRANTED and that Columbiana Hi Tech, LLC's Motion to Seal [Doc. #29] is GRANTED. A judgment dismissing this action will be entered contemporaneously.

This the 21st day of February, 2018.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge